**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

STATE OF CONNECTICUT,                     :        No.
    *Plaintiff,*                            :
                                            :
    v.                                     :
                                            :
THE UNITED STATES; THE                    :
DEPARTMENT OF THE INTERIOR; DOUG          :
BURGUM, SECRETARY OF THE                  :
INTERIOR; WILLIAM HENRY                   :
KIRKLAND III, ASSISTANT                   :
SECRETARY—INDIAN AFFAIRS; THE             :
BUREAU OF INDIAN AFFAIRS; BRIAN           :
MERCIER, DIRECTOR OF THE BUREAU           :
OF INDIAN AFFAIRS; THE OFFICE OF          :
FEDERAL ACKNOWLEDGMENT; NIKKI             :
BASS, DIRECTOR OF THE OFFICE OF           :
FEDERAL ACKNOWLEDGMENT,                   :
    *Defendants.*                           :        MAY 20, 2026

# Complaint for Declaratory and Injunctive Relief

## Introduction

1.    The State of Connecticut ("the State") brings this action to challenge the Final Rule on *Federal Acknowledgment of American Indian Tribes*, RIN 1976-AF67, 90 FR 3627 (Jan. 19, 2025) ("the Final Re-Petitioning Rule" or "the Final Rule"), in which Defendants assert the unprecedented authority to undo past acknowledgment decisions regardless of whether those decisions engendered serious reliance interests for the State and individuals and entities other than the federal government and were previously upheld by an Article III court. The Final Rule exceeds Defendants' statutory and constitutional authority and this Court should hold it unlawful and set it aside on that basis alone. But the Final Rule was also the product of unlawful

procedure and is arbitrary and capricious in both its substance and its application. Taken independently or together, the defects set forth in this Complaint establish that the Final Rule is unlawful and this Court should vacate it in its entirety.

## Parties

2.    Plaintiff the State of Connecticut is a sovereign state with compelling interests in, among other things, maintaining its jurisdiction over land within its boundaries, having Indian Tribes federally acknowledged as domestic dependent sovereigns within the State's boundaries only when their acknowledgment is legally valid, and the finality of administrative and judicial determinations that finally conclude that a petitioner for federal acknowledgment does not meet the requirements. In addition, the State represents the interests and defends the rights of its residents.

3.    Defendant the United States is a sovereign nation including all federal government agencies and officers charged with the administration of Indian affairs.

4.    Defendant the Department of the Interior ("the Department" or "the DOI") is an agency of the United States and is charged with primary supervision of Indian Affairs for the federal government. The Department is also responsible for promulgating and ensuring compliance with its regulations.

5.    Defendant Doug Burgum is the United States Secretary of the Interior ("the Secretary"), whose office is located at 1849 C Street, N.W., Washington D.C., 20240. The Secretary is responsible for the overall administration of the Department. Congress has delegated aspects of its authority relating to Indian affairs to the

Secretary. The Secretary claims Congress has delegated the authority to federally acknowledge groups as American Indian Tribes to the Secretary. The Secretary is sued in his official capacity only.

6.     Defendant William Henry Kirkland III is the Assistant Secretary for Indian Affairs ("the AS-IA"), whose office is located at 1849 C Street, N.W., MS-4660-MIB, Washington D.C., 20240. The Secretary purports to have delegated aspects of his claimed authority to federally acknowledge groups as American Indian Tribes to the AS-IA. The AS-IA purports to exercise authority under the Final Rule being challenged in this action. The AS-IA is sued in his official capacity only.

7.     Defendant the Bureau of Indian Affairs ("the BIA") is an office within the DOI and an agency with delegated responsibilities for the administration and management of certain federal authorities related to Indian tribes. The BIA's main office is located at 1849 C Street, N.W., MS-4660-MIB, Washington D.C., 20240. The BIA issued the Final Rule being challenged in this action.

8.     Defendant Brian Mercier is the Director of the BIA. His office is located at 1849 C Street, N.W., MS-4660-MIB, Washington D.C., 20240. He is sued in his official capacity only.

9.     Defendant the Office of Federal Acknowledgment ("the OFA") is an office within the Office of the AS-IA. The OFA's current mailing address is 1849 C Street, NW, Washington, DC 20240. The OFA purports to exercise authority under the Final Rule being challenged in this action.

10. Defendant Nikki Bass is the Director of the OFA, whose office is located at 1849 C Street, N.W., MS-4071-MIB, Washington D.C., 20240. Director Bass purports to exercise authority under the Final Rule being challenged in this action. She is sued in her official capacity only.

## Jurisdiction and Venue

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because this action raises substantial questions of federal law under the United States Constitution and the Administrative Procedure Act, 5 U.S.C. §§ 701–06 ("the APA").

12. The State challenges a final agency action under § 704 of the APA.

13. The Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, authorizes the requested declaratory and injunctive relief.

14. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1). The State brings this action against the United States and federal officers acting in their official capacities, the previously denied petitioners at issue are located in Connecticut, and a substantial part of the events giving rise to these claims occurred in Connecticut.

15. The United States has waived its sovereign immunity from suit under 5 U.S.C. § 702.

16. This Court has personal jurisdiction over Defendants pursuant to 28 U.S.C. § 1391(e) because they are the United States and federal agencies and officers of the United States.

4

## Allegations

## I.    The petitioning process, the prior final administrative and judicial decisions denying federal acknowledgment, and the pending request to re-petition.

17.    Federal acknowledgment is one of the most significantly consequential actions Defendants take in any context.

18.    Given the significance of federal acknowledgment, the process by which a group seeks federal acknowledgment is the most lengthy and extensive of any administrative processes.

19.    The process is carefully crafted to ensure that a petitioning group has every opportunity to make its case before a final decision.

20.    Petitioning groups have several stages of administrative review with multiple opportunities to develop and submit evidence.

21.    Throughout the process, petitioners have technical assistance from Defendants, including the OFA, which is staffed by historians, anthropologists, genealogists, and legal analysts.

22.    The administrative process for an acknowledgment petition often lasts decades.

23.    The administrative records in acknowledgment proceedings often range in excess of 30,000 pages to over 100,000 pages.

24.    Defendants have consistently—and correctly—maintained that the administrative federal acknowledgment process provides petitioners due process.

5

25. Defendants have also maintained that all of their past administrative determinations were "substantively sound" and that each of their "negative determinations was based on an exhaustive review of the facts and claims specific to each petitioner and a deliberate application of the criteria, resulting in a well-reasoned, legally defensible outcome." Second notice of proposed rulemaking, RIN 1076-AF67, *Final Acknowledgment of American Indian Tribes*, 89 FR 57097, 57104 (July 12, 2024) ("the 2024 Proposed Rule").

26. If the administrative process results in a final decision against acknowledgment, the petitioner has the opportunity to seek judicial review.

27. If a petitioner remains unsuccessful after the administrative process and judicial review, it can seek acknowledgment through Congress.

28. Since 1978, Congress has legislatively acknowledged at least 26 tribes and some groups seeking acknowledgment lobby Congress at the same time they pursue the administrative process for federal acknowledgment.

29. Connecticut's experience with the federal acknowledgment process is illustrative.

30. At least four unsuccessful petitioners denied federal acknowledgment are in Connecticut: the Eastern Pequot Indians of Connecticut ("the Eastern Pequot"), the Golden Hill Paugussett ("the GHP"), the Paucatuck Eastern Pequot Indians of Connecticut ("the Paucatuck Eastern Pequot"), and the Schaghticoke Tribal Nation ("the STN") (which has already re-petitioned) (collectively "the Connecticut Groups").

31.    The Eastern Pequot began the petitioning process in 1978 and the administrative process did not end until approximately 2005, approximately twenty-seven years later, with a Reconsidered Final Determination Denying Federal Acknowledgment to the Eastern Pequot Indians of Connecticut and the Paucatuck Eastern Pequot Indians of Connecticut.

32.    The Paucatuck Eastern Pequot began the petitioning process in 1989 and the administrative process did not end until approximately 2005, approximately sixteen years later with a Reconsidered Final Determination Denying Federal Acknowledgment to the Eastern Pequot Indians of Connecticut and the Paucatuck Eastern Pequot Indians of Connecticut.

33.    An entity identifying itself as the Historic Eastern Pequot Tribe sought reconsideration and later brought suit in District Court challenging the denial of federal acknowledgment. *See Historic E. Pequots v. Salazar*, 934 F. Supp. 2d 272 (D. D.C. 2013). The District Court dismissed the action. *See id.*

34.    An entity identifying itself as the Historical Eastern Pequot Tribe later brought another suit seeking to challenge the denial of acknowledgment. The District Court dismissed that action as well. *See Historical E. Pequot Tribe v. Office of Fed. Acknowledgment*, 2023 U.S. Dist. LEXIS 195610, at *1 (D. D.C. Nov. 1, 2023).

35.    The GHP submitted a letter of intent to petition in 1982.

36.    The GHP brought suits in both Connecticut Superior Court and the United States District Court for the District of Connecticut beginning in the early 1990s. The GHP's federal actions were brought "against various individuals,

corporations, and the State of Connecticut" and the GHP sought "possession of certain aboriginal and reservation lands in Bridgeport, Connecticut" as well as "money damages stemming from the alleged denial of the use and enjoyment of any rental income and profits due to it from the land and the fair market value thereof." *Golden Hill Paugussett Tribe of Indians v. Rell*, 463 F. Supp. 2d 192, 193-94 (D. Conn. 2006) (Arterton, J.) (quotation marks omitted).

37. The District Court initially rejected the GHP's claims for violation of the Nonintercourse Act based on a holding that the Department had primary jurisdiction over the determination of whether a group is entitled to federal acknowledgment as an Indian Tribe and dismissed the case. *See Golden Hill Paugussett Tribe of Indians v. Weicker*, 839 F. Supp. 130, 132-39 (D. Conn. 1993) (Dorsey, J.).

38. The GHP appealed the District Court's decision. The Second Circuit unanimously agreed that the Department had primary jurisdiction but instructed the District Court that a stay—rather than dismissal—was appropriate and remanded the case. *See Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 56-61 (2d Cir. 1994).

39. The Secretary finally administratively denied the GHP's petition in 2005, approximately twenty-three years after the GHP initiated the process.

40. After that denial, the defendants in the GHP's federal action moved for *inter alia* judgment on the pleadings based on the preclusive effect of the administrative denial.

41. The District Court granted judgment on the pleadings in favor of the defendants—twenty four years after the notice of intent was filed. *See Golden Hill Paugussett Tribe of Indians v. Rell*, 463 F. Supp. 2d 192, 193-202 (D. Conn. 2006) (Arterton, J.).

42. The GHP did not appeal the District Court's decision.

43. The STN initially filed suit in 1975, alleging *inter alia* violations of the Indian Nonintercourse Act of 1790, 25 U.S.C. § 177 ("the Nonintercourse Act").

44. The Nonintercourse Act requires a plaintiff to be a federally acknowledged tribe.

45. In 1981, the STN filed a letter of intent to petition for federal acknowledgment with the OFA.

46. The STN later submitted a 1,200-page long Petition for Acknowledgment to supplement its letter.

47. The STN later submitted over 8,000 pages and a computer disc with genealogy information to further support its petition.

48. The administrative process on the STN's petition ultimately culminated in a 92-page negative Reconsidered Final Determination Denying Federal Acknowledgment that was issued in 2005, over twenty years after the administrative process began.

49. The STN had substantial technical assistance from the Department during the administrative process.

9

50.     The STN appealed the Reconsidered Final Determination to District Court pursuant to the APA.

51.     Even though APA appeals are normally limited to the administrative record before the agency at the time of the administrative decision, the District Court granted the STN's requests for multiple rounds of discovery, including depositions and the submission of extra-record material.

52.     The STN's discovery demands added years of effort and litigation for the State and the impacted parties.

53.     The District Court ultimately affirmed the STN Reconsidered Final Determination in a published decision, finding it "thorough, rational, and well-reasoned." *Schaghticoke Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389, 414 (D. Conn. 2008) (Dorsey, J.).

54.     The STN appealed the District Court's decision to the Second Circuit.

55.     The Second Circuit unanimously affirmed the District Court's decision. *See Schaghticoke Tribal Nation v. Kempthorne*, 587 F.3d 132, 135 (2d Cir. 2009).

56.     The STN petitioned for certiorari seeking review of the Second Circuit's decision.

57.     The Supreme Court denied certiorari, with no Justice dissenting from the denial. See *Schaghticoke Tribal Nation v. Salazar*, 562 U.S. 947 (2010).

58.     The STN asked the Supreme Court to re-hear its denial of the STN's petition.

59. The Supreme Court denied the STN's request for re-hearing, again with no Justice dissenting. *See Schaghticoke Tribal Nation v. Salazar*, 562 U.S. 1089 (2010).

60. The State and other defendants then moved for judgment on the pleadings as to the STN's Nonintercourse Act claims. The District Court granted the motion on primary jurisdiction and collateral estoppel grounds in a published opinion. *United States v. 43.47 Acres of Land in the Cty. of Litchfield*, 896 F. Supp. 2d 151, 153-62 (D. Conn. 2012) (Thompson, J.).

61. The STN appealed the District Court's decision. The Second Circuit unanimously affirmed, approximately 39 years after the STN"s original suit was filed. *See Schaghticoke Tribal Nation v. Kent Sch. Corp. Inc.*, 595 F. App'x 32, 33 (2d Cir. 2014) (Summary Order).

62. Towns and other entities that would be impacted by the acknowledgment of the Connecticut groups invested countless hours and hundreds of thousands of dollars participating in the administrative acknowledgement processes and subsequent court proceedings.

63. The State spent countless hours and countless resources participating in the administrative acknowledgement processes and subsequent court proceedings.

64. Beyond those countless hours and resources, public threats of land claims and other impacts from federal acknowledgment caused negative economic impacts, anxiety, and stress for countless numbers of private residents of the State and the impacted towns.

11

65. Both Congress and the federal General Accounting Office recognized the negative impact of land claims on Connecticut.

66. The State and other impacted entities and individuals reasonably believed that the completion of the administrative and court proceedings involving the Connecticut Groups gave them the protection offered by fundamental principles of finality and repose.

67. The State and other impacted entities and individuals reasonably relied on the protection offered by fundamental principles of finality and repose to order their conduct and allocate resources.

68. The STN has now submitted a request to re-petition under the Final Rule.

69. The OFA has docketed the STN's request.

70. The State has already expended significant resources and incurred significant costs in response to the STN's request to re-petition.

71. The State will be forced to expend more resources and incur more costs if the STN's request to re-petition is allowed to proceed and even more resources if it is granted.

72. The STN's request to re-petition has undermined the State's interest in finality and the settled expectations of the State and its residents.

73. On information and belief, some or all of the other Connecticut Groups plan to submit requests to re-petition under the Final Rule.

74. When Defendants issued their prior decisions as to each of the Connecticut Groups, Defendants' regulations explicitly prohibited re-petitioning.

75. Any and all requests to re-petition under the Final Rule either have undermined or will undermine the State's interest in finality and the settled expectations of the State and its residents.

76. If and when some or all of the other Connecticut Groups submit requests to re-petition under the Final Rule, the State will be forced to expend significant resources and incur significant costs in response.

77. If and when some or all of the other Connecticut Groups submit requests to re-petition under the Final Rule, public threats of land claims and other impacts from federal acknowledgment will cause negative economic impacts, anxiety, and stress for countless numbers of private residents of the State and the impacted towns.

78. The State will be unable to recover some or all of the above-referenced resources and costs, has suffered irreparable harm, and will suffer additional irreparable harm if the Final Rule remains in place.

## II.     Background of the Final Rule.

79. Historically, requests for federal acknowledgment were sparse and the Secretary or representatives of the Department decided whether to grant acknowledgment on an *ad hoc* basis.

80. In 1977, the Department found that a recent increase in the number of requests for acknowledgment necessitated the development of procedures to enable that a uniform and objective approach be taken to acknowledgment.

81.    The regulations purporting to authorize Defendants to federally acknowledge Indian Tribes have been in place since 1978.

82.    The regulations never allowed re-petitioning before the Final Rule went into effect in 2025.

83.    From 1978 through 1994, the regulations did not explicitly speak to whether re-petitioning was permitted but Defendants consistently took the position that it was not.

84.    Defendants made the re-petitioning ban explicit in a 1994 change to the regulations.

85.    Defendants considered a change to the re-petitioning ban in 2015 but rejected it. *See Federal Acknowledgment of American Indian Tribes*, RIN 1076-AF18, 80 FR 37862 (July 1, 2015) ("the 2015 Final Rule).

86.    There were ample factual, legal, and policy bases to retain the re-petitioning ban in 2015 but Defendants failed to create a proper record to support their decision.

87.    Defendants' entire explanation for maintaining the ban on re-petitioning was set forth in a single paragraph in the 2015 Final Rule.

88.    As a result, two District Courts outside the Second Circuit held that Defendants' retention of the re-petitioning ban was arbitrary and capricious. *See Burt Lake Band of Ottawa and Chippewa Indians v. Bernhardt*, No. 17-0038 (ABJ), 2020 WL 1451566 (D. D.C. Mar. 25, 2020) ("*Burt Lake*"); *Chinook Indian Nation v.*

14

*Bernhardt*, No. 3:17-cv-05668-RBL, 2020 WL 128563 (W.D. Wash. Jan. 10, 2020) ("*Chinook*").

89.    Neither court held that the re-petitioning ban was unlawful, only that the limited explanation Defendants offered in the 2015 regulations for their decision to retain the ban was insufficient.

90.    Indeed, the *Chinook* court indicated that finality, the desire to protect settled expectations, and the desire to avoid unfairness to stakeholders who have already litigated against an unsuccessful petition—all arguments the State and other Commenters made but Defendants inexplicably failed to assert in the 2015 Final Rule—were "more convincing[ ]" reasons to maintain the re-petitioning ban than the ones Defendants offered.

91.    Both the *Chinook* court and the *Burt Lake* court held that Defendants had the statutory authority to maintain the then-existing ban on re-petitioning that kept existing negative determinations in place.

92.    Neither the *Chinook* court nor the *Burt Lake* court addressed the issue of whether Defendants had or have the statutory or constitutional authority to undo past negative determinations.

93.    Neither *Chinook* nor *Burt Lake* involved a prior administrative decision denying acknowledgment that had been upheld on judicial review.

94.    There were valid bases for Defendants to appeal from the decisions in both *Chinook* and *Burt Lake*.

15

95.    The decision in *Burt Lake* relied heavily on *Chevron* analysis, which the Supreme Court overruled in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024) ("*Loper Bright*"), before the Final Rule was adopted.

96.    Defendants did not appeal from the ruling in *Chinook* that Defendants reference in the Final Rule.

97.    Defendants appealed to the D.C. Circuit from the ruling in *Burt Lake* that Defendants reference in the Final Rule but moved for voluntary dismissal of their appeal before briefing or argument. The D.C. Circuit granted Defendants' motion and dismissed the appeal.

98.    Instead of pursuing appeals, Defendants accepted the remands and considered how to respond to the *Chinook* and *Burt Lake* decisions through the regulatory process.

99.    In 2022, approximately two years after the decisions in *Burt Lake* and *Chinook* and after careful consideration, Defendants again proposed to retain the re-petitioning ban. *See Federal Acknowledgment of American Indian Tribes*, RIN 1076-AF67, 87 FR 24908 (April 27, 2022) ("the 2022 Proposed Rule").

100.    This time, Defendants provided detailed reasons to support their decision to retain the long-standing re-petitioning ban.

101.    The reasons Defendants provided to support their decision to retain the long-standing re-petitioning ban in the 2022 Proposed Rule were sufficient to make Defendants' decision neither arbitrary nor capricious.

16

102. The State, among other Commenters, provided additional legal, factual, and policy reasons for Defendants to maintain the ban that had been in place for over forty years.

103. Following publication of the 2022 Proposed Rule, Defendants held two consultation sessions with only federally acknowledged tribes and a listening session with only present, former, and prospective petitioners for federal acknowledgment.

104. Defendants' decision to hold a listening session with only present, former, and prospective petitioners and to exclude the State and other third parties was a reversal of the Department's prior process, which allowed States and other third parties to participate in meetings with Defendants and their representatives.

105. After listening to only federally acknowledged tribes and potential petitioners and re-petitioners, Defendants proposed reversing the position they had consistently held for over four decades and had proposed maintaining based on detailed public analysis as recently as 2022, two years earlier.

106. In announcing their reversal, Defendants conceded that "the reasons" they gave to support "upholding the ban in the 2022 proposed rule were valid." *2024 Proposed Rule*, 89 FR at 57100.

107. Defendants explicitly stated that they were "proposing a revised approach here based on . . . reconsidered policy." *2024 Proposed Rule*, 89 FR at 57100.

108. The State and many other Commenters commented on the 2024 Proposed Rule.

17

109. "Most federally recognized Indian Tribes and State and local government representatives that submitted comments on the 2024 proposed rule oppose[d] re-petitioning." *Final Rule*, 90 FR 3634.

110. Despite that, Defendants reversed their long-standing ban on re-petitioning in the Final Rule.

111. Scholars and courts refer to rules issued in the period after a presidential election and before a transition to a different President's administration as "Midnight Rules."

112. Scholars have found that Midnight Rules are problematic and raise serious concerns.

113. The Final Rule was published in the Federal Register on January 15, 2025, five days before the Presidential transition.

114. Defendants' reversal culminating in the Final Rule exceeded their statutory and constitutional authority and was arbitrary, capricious, an abuse of discretion, and otherwise unlawful for reasons the State will detail in this Complaint.

## III. The United States Constitution gives Congress primary authority over Indian Tribes.

115. Article I, Section 8, of the United States Constitution gives Congress the power to *inter alia*, "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

116. By contrast, Article II of the United States Constitution—setting forth the powers and duties of the President—makes no explicit reference to Indian Tribes or Indians.

117.  Consistent with the Constitution's text, Defendants have conceded in court—and the courts Defendants rely on in the Final Rule concluded—that Congress has the authority to determine the criteria for federal acknowledgment of an Indian Tribe.

## IV. Defendants claim that Congress has delegated its authority to federally acknowledge Indian Tribes to the Secretary and fail to address the impact of recent United States Supreme Court precedent on the analysis.

118.  Delegations of authority by statute are subject to constitutional limits.

119.  Defendants are required by law to operate within the scope of the statutory authority Congress gives them.

120.  When an agency issues a rule, the first inquiry is whether the rule is within the scope of the agency's statutory authority.

121.  A federal agency literally has no power to act unless and until Congress confers power upon it.

122.  Before taking action, Defendants are required by law to identify a statutory grant of authority that allows them to take the action at issue.

123.  The Supreme Court has emphasized that when there is ambiguity about the scope of the authority a statute or statutes grant an agency, judicial abdication in favor of the agency is **least** appropriate.

124.  In the Final Rule, Defendants took the position that Congress has delegated to the executive branch, specifically the Secretary, the power to federally acknowledge Indian Tribes.

125. In the State's Comments on the 2024 Proposed Rule, the State challenged the Secretary's assertion of the authority to federally acknowledge Indian Tribes as an initial matter.

126. The statutes Defendants relied on to support that claimed delegation do not set forth any criteria to guide or limit Defendants' exercise of their claimed acknowledgment power, which raises constitutional concerns.

127. The State also informed Defendants that United States Supreme Court decisions issued after the Circuit Court decisions Defendants relied on cast serious doubt on those Circuit Court decisions' continuing validity. The State specifically informed Defendants of both the Supreme Court's decision in *Loper Bright*, which courts have referred to as a sea change in administrative law and agency authority, and the Court's Major Questions Doctrine, which the Court identified as a named doctrine after the decisions Defendants cited and had begun to shape—and continues to shape—how courts interpret claimed delegations of authority to the executive branch and protect the Constitution's core concepts of separation of powers and federalism.

128. Defendants did not address the State's Comments regarding Defendants' lack of general statutory authority to federally acknowledge Indian Tribes in the Final Rule.

129. Defendants did not mention or cite the United States Constitution in the Final Rule.

130.   Defendants did not cite or analyze *Loper Bright*, the Supreme Court's Major Questions Doctrine, or any of the Supreme Court's decisions applying *Loper Bright* or the Major Questions Doctrine in the Final Rule.

131.   In the Final Rule, Defendants made Technical Revisions to their statutory authority citation but their discussion of statutory authority was substantively identical to their discussion in the 2024 Proposed Rule.

132.   In the Final Rule, Defendants did not respond to the State's arguments that they lack the statutory authority to federally acknowledge tribes as an initial matter.

## V.   None of the statutes Defendants rely on for their claimed authority to promulgate the Final Rule grant them authority to allow re-petitioning.

133.   Even if Defendants had the authority to federally acknowledge Indian Tribes as an initial matter (they do not), that authority would be distinct from the authority to retroactively undo past determinations that an unsuccessful petitioner is not entitled to federal acknowledgment.

134.   When Congress intends to delegate authority to take action that contravenes prior final decisions it says so explicitly.

135.   None of the statutes on which Defendants relied to support their assertion of the power to promulgate the Final Rule allow Defendants to undo past final determinations or to disregard either the principles of res judicata and collateral estoppel or the broader interests of the judicial system and participants in prior proceedings in finality, either explicitly or otherwise.

136. The State informed Defendants of that problem in its Comments on the 2024 Proposed Rule, with citations to United States Supreme Court authority that supported the State's position that Defendants lacked statutory authority to allow re-petitioning.

137. The State's representatives in Congress likewise informed Defendants of the problem in their written Comments.

138. In the Final Rule, Defendants—as an executive branch agency—explicitly assert that they have and purport to exercise the "inherent authority" to undo past decisions "[i]f an unsuccessful petitioner plausibly alleges" that Defendants' own self-imposed regulatory changes "would change the outcome of the petitioner's previous, negative final determination." *Final Rule*, 90 FR at 3639 (quotation marks omitted). Defendants assert that they have that authority even when those decisions "engendered serious reliance interests" for individuals and entities other than the federal government and were "previously upheld by a court." *Id.*

139. The authority Defendants assert is unprecedented. Defendants cited no authority in the Final Rule upholding an agency's assertion of similar authority under comparable circumstances.

140. Defendants were required to provide the legal bases for their assertion of authority in the Final Rule.

141. Defendants' failure to provide a valid legal basis for the Final Rule in the Final Rule renders it invalid.

22

142. In the Final Rule, Defendants cited a total of five cases they claimed support their assertion of the inherent authority to undo past administrative decisions regardless of whether those decisions were upheld following Article III judicial review.

143. None of those decisions support Defendants' claimed authority to undo past administrative determinations after judicial review.

144. Four of the five cases Defendants cite are readily distinguishable.

145. One of the five decisions did present an analogous issue, but—contrary to Defendants' implied assertion in the Final Rule—that decision clearly and explicitly **rejected** Defendants' assertion that an agency can undo judicial decisions.

146. In the State's Comments, the State made an argument similar to the argument the court made in rejecting Defendants' implied assertion in the Final Rule in its Comments on the 2024 Proposed Rule with citations to Supreme Court authority. Defendants did not address the argument in the Final Rule.

147. Defendants' failure to recognize that the authority the Final Rule relies on does not support the power they seek to assert alone renders the Final Rule unlawful and requires it be set aside.

148. The Supreme Court has never ratified the proposition that administrative agencies possess the inherent authority to substantively reconsider their adjudications in the absence of express statutory or regulatory authority allowing them to do so. No such statutory or regulatory exists here. To the contrary,

the regulations in place at the time of the final administrative decisions at issue explicitly stated that unsuccessful petitioners were not allowed to re-petition.

149. Recent Supreme Court decisions cast serious doubt on the inherent reconsideration authority Defendants purport to assert in the Final Rule. The Final Rule does not recognize or address those decisions.

150. Where agencies have been found to have inherent reconsideration authority, its source has been the agency's underlying power to decide the initial issue. Here, Defendants lacked the authority to make the initial acknowledgment decisions and therefore have no inherent authority to reconsider those decisions.

151. In the limited circumstances where an agency has previously been held to have the inherent authority to reconsider past decisions (Defendants do not here), courts have made clear that authority is subject to several limitations.

152. The agency must perform any inherent authority reconsideration within a short and reasonable time period.

153. Defendants issued the Reconsidered Final Determination to Decline to Acknowledge the STN in October 2005. *See* 70 FR 60101. Defendants also issued their other final decisions as to the other denied petitioners located in Connecticut in 2005.

154. 2005 was over twenty years ago.

155. Defendants denied other petitions in 1981, over forty years ago.

156. Twenty to forty years is not a short time period.

157. Twenty to forty years is not a reasonable time period.

158. In the Final Rule, Defendants do not recognize or address the time limitations on the inherent reconsideration authority they purport to exercise.

159. An agency must give notice of its inherent reconsideration authority at the relevant time. Defendants failed to do so here. To the contrary, the regulations in place at the relevant time explicitly did not allow re-petitioning. The Final Rule does not recognize or address that issue.

160. Even if Defendants had the authority to issue regulations allowing them to reconsider final determinations regardless of whether those determinations engendered serious reliance interests for the State and other third parties and were previously upheld by a court (they do not), those regulations could apply only prospectively.

161. At the times the initial petitions by the Connecticut Groups were denied, the federal acknowledgment regulations explicitly provided that "[a] petitioner that has petitioned under this part or under the acknowledgment regulations previously effective and that has been denied Federal acknowledgment may not re-petition under this part." *Procedures for Establishing That an American Indian Group Exists as an Indian Tribe*, 59 FR 9280, 9298 (Feb. 25, 1994) (quoting then-25 CFR 83.10(p)).

162. Defendants cite no authority in the Final Rule that would allow them to deprive the State and other third parties of explicit regulatory protections that were in place at the time the prior decisions were issued.

163. Agencies cannot use their inherent reconsideration authority as a guise for changing previous decisions on policy grounds. That is explicitly what Defendants

25

purport to do here. The Final Rule does not recognize or address that limitation on agencies' inherent reconsideration authority.

164. Agencies cannot use their inherent reconsideration authority when the parties to the initial proceeding relied on the prior decision. That is exactly what Defendants purport to do here. The Final Rule does not recognize or address that limitation on agencies' inherent reconsideration authority.

165. The Final Rule is in excess of Defendants' statutory authority and this Court should hold it unlawful and set it aside as a result. *See* 5 U.S.C. § 706(2)(C).

166. The Final Rule is unconstitutional to the extent it purports to allow Defendants to retroactively undo past administrative determinations that impact the rights and interests of third parties including, but not limited to, administrative determinations that either were or could have been upheld on judicial review. This Court should hold the Final Rule unlawful and set it aside as a result. *See* 5 U.S.C. § 706(2)(A) and (B).

167. The Final Rule is arbitrary, capricious, and an abuse of discretion because the legal authority it cites in support of Defendants' unprecedented assertion of statutory authority establishes that Defendants lack that authority but Defendants either inadvertently or intentionally misrepresented the nature of the authority to the public.

## VI. The Major Questions Doctrine, the Federalism Canon, and/or the Canon of Constitutional Avoidance further establish that the Final Rule exceeds Defendants' statutory authority and that this Court should set it aside.

168. In its Comments on the 2024 Proposed Rule, the State argued in detail that the Supreme Court's Major Questions Doctrine supported the State's argument that Defendants lacked the authority to promulgate the Final Rule.

169. The State pointed out that Defendants had admitted in earlier enactments that "'Federal acknowledgment is one of the most significantly consequential actions the Department takes in any context.'" *2024 Comments*, p. 1 (quoting 87 FR.24914).

170. According to the Department, that is because acknowledgment "'has innumerable consequences'" for both the "'newly acknowledged tribe and for third parties.'" *2024 Comments*, p. 2 (quoting 87 FR.24914). For third parties, the Department has admitted that "'acknowledgment changes legal considerations including Tribal sovereign immunity and environmental regulation.'" *Id.* (quoting 87 FR 24914).

171. Multiple Justices and Judges have recognized that tribal sovereign immunity significantly limits, and often extinguishes, the states' ability to protect their citizens and enforce the law against tribal businesses.

172. Federally acknowledged Tribes operate businesses both on and off tribal land in the state or states in which their tribal lands are located.

173. Federally acknowledged Tribes operate businesses that extend outside of the state or states in which their tribal lands are located.

27

174. Federally acknowledged Tribes may operate businesses that would be illegal under the law of the state or states in which their tribal lands are located or the other states they reach into if those businesses were operated by a non-tribal entity.

175. Tribal sovereign immunity renders those businesses largely litigation-proof.

176. Tribal sovereign immunity limits and sometimes extinguishes the ability of state and local governments to collect generally applicable taxes on businesses that either are tribal or claim to be tribal.

177. Tribal sovereign immunity limits and sometimes extinguishes the ability for tort victims to recover for harms, including death.

178. Tribal sovereign immunity limits the ability of states to protect against conduct that may violate antitrust law, such as illegal price fixing and other forms of unfair competition.

179. Tribal sovereign immunity limits and sometimes extinguishes the ability to protect against copyright infringement.

180. Some federally acknowledged Tribes have asserted tribal sovereign immunity as a defense against violations of state campaign finance laws.

181. Some federally acknowledged Tribes have used their tribal sovereign immunity to operate in areas heavily regulated by states in ways that put them at a distinct advantage over competitors who are subject to those regulations.

28

182. For example, as Justice Thomas noted, unscrupulous payday lenders have arranged for fee sharing with federally acknowledged Tribes to allow the lenders to use tribal sovereign immunity as a shield from state usury and consumer protection laws. *See Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 823 (2014) (Thomas, J., dissenting, joined by Scalia, and Ginsburg, Js.).

183. As the State informed Defendants in its Comments on the 2024 Proposed Rule, entities claiming to be arms of a federally acknowledged Tribe issued loans to Connecticut residents at annual percentage rates ranging from 199.44 to 398.20%. Those rates dwarfed the rates permitted under Connecticut law by orders of magnitude.

184. After years of litigation between the State and a federally-acknowledged out-of-state Tribe, the Connecticut Supreme Court ultimately held that federal tribal sovereign immunity prevented the State from enforcing aspects of its laws intended to protect Connecticut citizens. *Great Plains Lending, LLC v. Dept. of Banking*, 339 Conn. 112, 259 A.3d 1128 (2021).

185. Federal acknowledgment can also prevent States from enforcing environmental regulations intended to protect States and their residents.

186. The State pointed out to Defendants that federal acknowledgment has many impacts other than tribal sovereign immunity and limitations on state environmental regulation.

187. One impact of federal acknowledgment is land claims.

188.    Congress has made findings specific to Connecticut that land claims "place[ ] a cloud on the titles to much of the land" in the impacted area and "result[ ] in severe economic hardships for the residents of the" area. *Mashantucket Pequot Indian Claims Settlement Act*, PL 98-134, 97 Stat. 851, § 2(b).

189.    Congress has also found that land claims "will likely result in economic hardships for residents of the State of Connecticut" and the impacted towns "by encumbering the title to lands in the State, including those that are not" directly "the subject of" the claim. *Mohegan Nation of Connecticut Land Claims Settlement Act of 1994*, PL 103-377, 108 Stat. 3501, § 2(a)(6) (Oct. 19, 1994).

190.    The State detailed how "in the early 1990s the Golden Hill Paugussett ('the GHP') filed suit in Federal District Court alleging that the GHP once 'exclusively owned, used, and occupied much of the southwestern part of the state of Connecticut' and seeking land 'within modern day Bridgeport' (Connecticut's largest city) based on an alleged violation of the Indian Nonintercourse Act of 1790, 25 U.S.C. § 177 ('the Nonintercourse Act').'" *2024 Comments*, p. 2 (quoting *Golden Hill Paugussett Tribe of Indians v. Weicker*, 839 F. Sup. 130, 132 (D. Conn. 1993)). The GHP later filed suit against 1,200 property owners, including private homeowners, and publicly threatened suit against 640,000 defendants, nearly 20 percent of the State's population at that time. *Id.* at 3-4.

191.    The State pointed out to Defendants that the federal General Accounting Office researched the impact of the GHP's past land claims, finding that

they clouded the title of landowners and made it difficult for landowners to obtain title insurance, sell property, and obtain or refinance mortgages.

192. In Comments on the 2024 Proposed Rule, Clan Mother Shoran Waupatukuay Piper, the claimed leader of the GHP, asserted that the GHP's "aboriginal territory and aboriginal claim amount to some one third of the state [of Connecticut] and a small portion of the state of New York" and that if the GHP "filed the entire claim under the same statute, it would be valued at $10 billion and encompass 366,000 individual defendants with the potential to shut down title companies in most of the United States."

193. In connection with the GHP's past land claims, "the GHP 'publicly stated' that it was 'aware of [the] financial devastation its land claims may create.'" *2024 Comments*, p. 4.

194. The GHP is just one potential re-petitioner. According to the Final Rule, there were thirty-three others as of November 9, 2024. *See* 90 FR at 3630 n. 57. They are located in sixteen states: Alabama, California, Colorado, Connecticut, Florida, Georgia, Indiana, Massachusetts, Michigan, New Jersey, Oklahoma, Oregon, Tennessee, Washington, Wisconsin, and Vermont.

195. Four of those potential re-petitioners, including the GHP, are in Connecticut: the STN (which has already re-petitioned), the Eastern Pequot Indians of Connecticut, the GHP, and the Paucatuck Eastern Pequot Indians of Connecticut.

196. Trust land acquisitions are another major impact of federal acknowledgment.

31

197. Federal acknowledgment entitles some Indian Tribes to apply to have Defendants take land into trust on the Tribe's behalf, which exempts the land from most state and local taxation, gives the Tribe heightened regulatory jurisdiction over the lands, and limits state and local jurisdiction and regulatory authority over the land.

198. Defendants have conceded that trust acquisitions have negative consequences for the impacted state and local communities.

199. Defendants took the position in earlier litigation in Connecticut that they could take a large portion of southeastern Connecticut into trust on behalf of one of the State's two already federally acknowledged Indian Tribes.

200. Since Defendants took that position, they have changed the land into trust regulations with the express intent of making acquisitions easier for Tribes in ways that offer states and local communities less protection. Defendants have also removed the geographic restrictions on trust acquisitions, meaning that a federally acknowledged Indian Tribe may seek to have land taken into trust anywhere in the state where it is located or anywhere in the United States. This is particularly problematic for small states like Connecticut.

201. The Final Rule could give four more groups in Connecticut—and twenty-nine more nation-wide—another opportunity to be entitled to have Defendants take land into trust on their behalf.

202.    As of 2023, Defendant the Bureau of Indian Affairs had acquired over a million acres of land into trust for Tribes and individual Indians. That is an area larger than Rhode Island.

203.    Federal acknowledgement allows an Indian Tribe to operate under the Indian Gaming Regulatory Act ("the IGRA"). *See* 25 U.S.C. § 2703(5).

204.    As of 2012, federally acknowledged Tribes had gaming operations in 28 states and combined revenues of $27.9 billion.

205.    Perhaps most fundamentally, federal acknowledgment gives the United States government a fiduciary trust relationship to the Tribe and its members.

206.    Defendants have interpreted that trust relationship as requiring them to protect the interests of federally acknowledged Indian Tribes and their members when the interests of the Tribe and/or its members conflict with the interests of non-tribal citizens.

207.    Federal acknowledgment has many other consequences for the impacted states and their residents.

208.    The Major Questions Doctrine applies when a federal agency seeks to intrude into an area that is the particular domain of state law, when an agency threatens to violate the separation of powers, and/or when an agency seeks to take action that will have major financial impacts on states, entities, or individual citizens.

209.    Taken independently or together, the innumerable consequences that follow from federal acknowledgment establish that the Major Questions Doctrine applies to the Final Rule.

210. Defendants lack statutory authority for the Final Rule under even ordinary rules of statutory construction.

211. To the extent there would be any doubt that Defendants lack statutory authority for the Final Rule under ordinary rules of statutory construction, the Major Questions Doctrine (either on its own or in conjunction with other doctrines and canons) establishes that Defendants lack statutory authority for the Final Rule.

212. To the extent there would be any doubt that Defendants lack statutory authority for the Final Rule under ordinary rules of statutory construction, the federalism canon (either on its own or in conjunction with other doctrines and canons) establishes that Defendants lack statutory authority for the Final Rule.

213. To the extent there would be any doubt that Defendants lack statutory authority for the Final Rule under ordinary rules of statutory construction, the canon of constitutional avoidance (either on its own or in conjunction with other doctrines and canons) establishes that Defendants lack statutory authority for the Final Rule.

214. None of the authority Defendants relied on in the Final Rule analyzed the impact of the Major Questions Doctrine on Defendants' claim to unprecedented statutory authority.

215. None of the authority Defendants relied on in the Final Rule analyzed the impact of the federalism canon on Defendants' claim to unprecedented statutory authority.

216.    None of the authority Defendants relied on in the Final Rule analyzed the impact of the canon of constitutional avoidance on Defendants' claim to unprecedented statutory authority.

217.    The statutes Defendants rely on to support their claimed authority would violate the nondelegation doctrine if they in fact granted Defendants the authority Defendants assert.

218.    The statutes Defendants rely on to support their claimed authority would violate the Constitution's separation of powers principles if they in fact granted Defendants the authority Defendants assert.

219.    The statutes Defendants rely on to support their claimed authority would violate Article III of the Constitution if they in fact granted Defendants the authority Defendants assert.

220.    The statutes Defendants rely on to support their claimed authority would violate principles of federalism in the Constitution if they in fact granted Defendants the authority Defendants assert.

**VII. Even if Defendants had the statutory and constitutional authority to promulgate the Final Rule, the procedure that led to the Final Rule was unlawful and the Final Rule's substance is too.**

    **A. The Department used a discriminatory, unconstitutional, and unlawful process leading up to the Final Rule that reflected an arbitrary and capricious unexplained reversal of policy.**

        **1. The process that led to the Final Rule discriminated in violation of law and reflected an arbitrary and capricious reversal of policy.**

221.  The moral imperative of neutrality has long been understood to be the driving force of the Equal Protection Clause.

222.  The United States Supreme Court has held that discrimination in favor of federally acknowledged Indian Tribes does not trigger strict scrutiny under the Constitution because it is based on the federal government's unique political relationship with federally acknowledged Indian Tribes.

223.  Defendants have already made final determinations that previously denied petitioners do not have a unique political relationship with the federal government.

224.  Given Defendants' past final determinations, any discrimination Defendants engaged in in favor of previously denied petitioners and against third parties who would be impacted by the Final Rule must satisfy strict scrutiny.

225.  The Final Rule does not seek to justify Defendants' discrimination in favor of unsuccessful petitioners and against third parties under any level of constitutional scrutiny.

36

226.    The Final Rule does not seek to justify Defendants' discrimination in favor of unsuccessful petitioners and against third parties as required or permitted under any statute or other legal basis.

227.    The Department held public meetings at nine locations around the country in the process of considering what became the 1994 Final Rule.

228.    The Department held five public meetings at various locations around the country in the process of considering what became the 2015 Final Rule.

229.    By contrast, the Department held two consultation sessions with federally recognized Indian Tribes and a listening session with present, former, and prospective petitioners for Federal acknowledgment in the process of what became the Final Rule at issue here. The Department did not hold any public meetings.

230.    The Final Rule states that the Department considered its consultation sessions with federally recognized Indian Tribes and its listening session with present, former, and prospective petitioners for Federal acknowledgment in deliberating whether to change its decades-old policy against allowing re-petitioning and in deciding to make that reversal.

231.    The State explicitly raised concerns with Defendants' discriminatory policy change on who was given an opportunity to meet and talk with Defendants in its Comments and explained those concerns in detail.

232.    The Department did not offer any explanation in the Final Rule for why it changed its policy to limit its meetings to only federally recognized Indian Tribes

and a listening session with present, former, and prospective petitioners for federal acknowledgment.

233. An agency may not depart from a prior policy *sub silentio*.

234. Defendants' failure to explain the change in policy alone rendered it arbitrary, capricious, and unlawful.

235. Unexplained inconsistency between agency actions is a reason for holding a shift in policy to be arbitrary and capricious.

236. To the extent Defendants' policy change was based on their general trust relationship with Indian Tribes, recent Supreme Court precedent has cast doubt on the source and scope of that relationship and whether it applies where—as here—the issue is a zero sum one and involves negative impacts on states and other third parties.

237. The Final Rule does not cite any precedent that applied the federal trust relationship in favor of groups that claimed tribal status but had been denied it.

238. The State was ready, willing, and able to send a representative or representatives to a public meeting if Defendants had one that was not limited to federally recognized Indian Tribes or present, former, and prospective petitioners for federal acknowledgment and reacted to or rebutted the arguments made by others at the meeting.

239. If Defendants had allowed the State to send a representative or representatives to speak with Defendants, the State would have been able to expand on and emphasize its arguments—including, but not limited to, its arguments that

Defendants lacked the constitutional or statutory authority to revisit past final determinations and Defendants would have been compelled to maintain the re-petitioning ban or otherwise protect the State's interest in finality.

240. There is a high likelihood that the opportunity to meet with Defendants would have changed the result given the large volume of Comments and that the State (and other excluded Commenters making similar arguments to the State) made detailed and nuanced arguments that Defendants may have failed to fully appreciate on the papers alone.

241. The clear defects in the Final Rule indicate that Defendants failed to appreciate those arguments.

242. As the State pointed out in its Comments, the Supreme Court has found that it is unfair and unjust for a decision-maker to deprive one side of an argument of an opportunity to make its case orally while allowing the other side of the argument to do so.

243. In addition, Executive Order 13132—titled "Federalism" ("the Federalism Executive Order")—required Defendants to treat state and local governments equivalently to how Defendants treated federally acknowledged Indian Tribes. That Executive Order implements the Unfunded Mandates Reform Act of 1995, 2 U.S.C. § 1531 *et seq.*, and has the force of law.

244. The Federalism Executive Order rendered Defendants' unexplained reversal of policy leading them to hold two consultation sessions with federally

acknowledged Indian Tribes and to offer no opportunity for state and local governments to meet with Defendants unconstitutional and unlawful.

245. The Federalism Executive Order rendered Defendants' unexplained reversal of policy leading them to hold two consultation sessions with federally acknowledged Indian Tribes and to offer no opportunity for state and local governments to meet with Defendants arbitrary and capricious.

246. Defendants' discrimination in favor of previously denied petitioners and against non-tribal third parties violated the APA.

247. Defendants' discrimination in favor of previously denied petitioners and against non-tribal third parties violated the Equal Protection Clause of the Fifth Amendment.

## 2. The Final Rule's treatment of the Regulatory Flexibility Act was arbitrary and capricious.

248. The Regulatory Flexibility Act ("the RFA") generally requires federal agencies issuing a rule to analyze the impact of the rule on small entities, including small governmental jurisdictions. *See* 5 U.S.C. § 601(5).

249. The RFA defines "small governmental jurisdiction" to mean "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand, unless an agency establishes, after opportunity for public comment, one or more definitions of such term that are appropriate to the activities of the agency and which are based on such factors as

location in rural or sparsely populated areas or limited revenues due to the population, and publishes such definition(s) in the Federal Register." 5 U.S.C. § 601(5).

250. Defendants have not published a definition of "small governmental jurisdiction" in the Federal Register that differs from the RFA's definition of that term.

251. The RFA defines "small organization" as "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field, unless an agency establishes, after opportunity for public comment, one or more definitions of such term that are appropriate to the activities of the agency and which are based on such factors as location in rural or sparsely populated areas or limited revenues due to the population, and publishes such definition(s) in the Federal Register." 5 U.S.C. § 601(5).

252. Defendants have not published a definition of "small organization" in the Federal Register that differs from the RFA's definition of that term.

253. The RFA defines the term "small entity" to "have the same meaning as the terms 'small business', 'small organization' and 'small governmental jurisdiction'" as defined elsewhere in the RFA. 5 U.S.C. § 601(6).

254. An agency can avoid doing the analysis the RFA generally requires "if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities. If the head of the agency makes a certification under the preceding sentence, the agency shall publish such certification in the Federal Register at . . . the time of publication of the

final rule, along with a statement providing the factual basis for such assertion." 5 U.S.C. § 605(b).

255.   The Final Rule purports to include such a Certification. *See Final Rule*, 90 FR at 3641-42.

256.   The purported Certification in the Final Rule does not state that it was made by "the head of the agency" as the RFA requires. 5 U.S.C. § 605(b).

257.   The purported Certification in the Final Rule does not provide the "factual basis" to support its assertion that the Final Rule will not "have a significant economic impact on a substantial number of small entities" that the RFA requires. 5 U.S.C. § 605(b).

258.   The State argued in its Comments that if the Proposed Rule became the Final Rule, it would impact a "substantial number of small entities."

259.   The purported Certification in the Final Rule does not respond to the State's argument, let alone provide a factual basis to support an assertion that the Final Rule will not impact a substantial number of small entities.

260.    The State argued in its Comments that if the Proposed Rule became the Final Rule, it would "have a significant economic impact" on the impacted small entities.

261.   The purported Certification in the Final Rule does not respond to the State's argument, let alone provide a factual basis to support an assertion that the Final Rule's impact on the affected small entities will not be significant.

262.   The purported Certification in the Final Rule fails to meet the RFA's requirements.

42

263. The State cited caselaw in its Comments demonstrating that the purported Certification in the Final Rule fails to meet the RFA's requirements but the Final Rule failed to address that caselaw or to make the Certification compliant.

264. The purported Certification in the Final Rule does not reflect a reasonable, good-faith effort to comply with the RFA.

265. The status quo before the Final Rule was that repose and finality protected small governmental jurisdictions and small organizations from the impacts of federal acknowledgment of previously denied petitioners.

266. The Final Rule has required and will require small governmental jurisdictions and small organizations to expend significant economic resources to comment on requests to re-petition.

267. The Final Rule does not address that issue or provide any evidence or analysis to support a conclusion that the costs associated with commenting on requests to re-petition will be insignificant to small governmental jurisdictions and small organizations.

268. The costs associated with responding to the STN request to re-petition have already been significant to the impacted small governmental jurisdictions and small organizations.

269. Those costs will only grow if the Final Rule remains in place.

270. The costs of commenting alone are significant enough to small entities to have required the head of the agency to either perform the analysis required under

the RFA or provide a valid factual basis for refusing to do so in the Final Rule's RFA Certification.

271. In addition to the costs of commenting, the purported Certification in the Final Rule correctly acknowledges that impacted small entities "might later incur additional costs to challenge actions taken by a newly acknowledged Indian Tribe following a positive determination on a re-petition (like the pursuit of land in trust or the pursuit of gaming on trust land)" but dismisses those costs based on *ipse dixit* that "those costs would arise in processes 'entirely separate and distinct . . . from the Part 83 processes' at issue here, as discussed above." *Final Rule*, 90 FR at 3641 (quoting 80 FR 37881).

272. The purported Certification's reliance on information elsewhere in the Final Rule to purportedly comply with the RFA was improper.

273. The purported Certification provides no authority to support its assertion that costs resulting from the Final Rule somehow become insubstantial because they involve other processes.

274. The assertion in the purported Certification that costs resulting from the Final Rule somehow become insubstantial because they involve other processes is inconsistent with the RFA.

275. The reasoning in the purported Certification has no basis in fact.

276. The reasoning in the purported Certification fails to consider the economic impact of consequences that would immediately follow federal

acknowledgment, including—but not limited to—eligibility for gaming under the IGRA and tribal sovereign immunity.

277. The reasoning in the purported Certification improperly measures the significance of the Final Rule's economic impact relative to a theoretical rule that would have caused greater economic impact rather than relative to the existing status quo the actual Final Rule would alter.

278. The reasoning in the purported Certification has no basis in law. It treats "unsuccessful petitioners" as "one type of small entity" covered by the RFA even though they do not fall within any of the RFA's categories of small entity.

279. The purported Certification does not point to any definition of small entity the agency established and published in the Federal Register that would include unsuccessful petitioners. *See* 5 U.S.C. § 601(5).

280. The purported Certification does not offer any legal analysis to support its conclusion that "unsuccessful petitioners" are "one type of small entity" covered by the RFA.

281. Defendants' non-compliance with the RFA supports the State's argument that the Final Rule is arbitrary and capricious.

### 3. The Final Rule's treatment of the Federalism Executive Order was unlawful and arbitrary and capricious.

282. Defendants' non-compliance with the Federalism Executive Order further supports the State's argument that the Final Rule is unlawful and arbitrary and capricious.

283. Section 1(a) of the Federalism Executive Order defines "'[p]olicies that have federalism implications'" to include "regulations . . . that have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government."

284. Defendants have previously—and correctly—recognized that "Federal acknowledgment is one of the most significantly consequential actions the Department takes in any context," in significant part because of its effects on the impacted States.

285. Federal acknowledgment of an Indian Tribe within a State's boundaries has substantial direct effects on the impacted State.

286. Federal acknowledgment of an Indian Tribe within a State's boundaries has substantial direct effects on the relationship between the national government and the States.

287. Federal acknowledgment of an Indian Tribe within a State's boundaries has substantial direct effects on the distribution of power and responsibilities among the various levels of government.

288. The sum total of the Final Rule's discussion of the Federalism Executive Order is a statement that: "Under the criteria in section 1 of E.O. 13132, this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement. A federalism summary impact statement is not required." *Final Rule*, 90 FR at 3642.

289. The Final Rule's treatment of the Federalism Executive Order's requirements is unlawful.

290. The Final Rule's treatment of the Federalism Executive Order's requirements is arbitrary and capricious.

291. Consultation with state and local officials before issuing the Final Rule would have been practicable.

292. Defendants did not consult with appropriate state and local officials to determine whether the Federal objectives reflected in the Final Rule could be attained by other means.

293. The Final Rule has federalism implications.

294. The Final Rule is not required by statute.

295. The Final Rule imposes substantial direct compliance costs on state and local governments.

296. Defendants' treatment of Executive Order 13175—titled "Consultation and Coordination With Indian Tribal Governments" ("the Tribal Executive Order")— further demonstrates that Defendants' treatment of the Federalism Executive Order was both unlawful and arbitrary and capricious.

297. Despite the effectively identical operative language of the Federalism Executive Order and the Tribal Executive Order, Defendants treated the two differently.

298. Defendants' disparate treatment of the similar Federalism Executive Order and Tribal Executive Order renders the Final Rule unlawful.

299. Defendants' unexplained disparate treatment of the similar Federalism Executive Order and Tribal Executive Order renders the Final Rule arbitrary and capricious.

## B. The Final Rule is substantively unlawful.

### 1. The Final Rule fails to consider many important aspects of the problems it creates for third parties and gives short shrift to the aspects it purports to consider.

300. The Final Rule reflects a change from a prior policy that engendered serious reliance interests that the agency was required to take into account and explain with a more detailed justification than the agency would need for an initial policy decision.

301. The Final Rule entirely fails to consider many important aspects of the problem. One of the most notable is the consequences the Final Rule will have on state and local governments and their citizens.

302. The Final Rule seeks to minimize the issue by saying "[i]n general, the part 83 process concerns **only** whether a group constitutes a distinct social and political entity entitled to a government-to-government relationship with the United States." *Final Rule*, 90 FR at 3635 (emphasis added).

303. Contrary to Defendants' assertion, the determination that a group is a political entity that has a government-to-government relationship with the United States does not concern only the United States and the petitioner—it has immediate, far-reaching and fundamental consequences for states, localities, and third parties.

48

304. One consequence is that Defendants take the position that the United States has a trust relationship with federally acknowledged Tribes that requires the United States to treat the members of that group more favorably than their neighbors, who—before acknowledgment—were entitled to be treated equally by their federal government.

305. Defendants did not consider and address that consequence in the Final Rule.

306. In the past, the Department has publicly acknowledged that federal acknowledgment of an Indian Tribe has innumerable consequences and negative impacts on state and local governments that include tribal sovereign immunity and limitations on environmental regulation.

307. Even though the Department has identified tribal sovereign immunity as a consequence for state and local governments in the past and the State explicitly raised the issue in its Comments on the 2024 Proposed Rule, the Final Rule does not consider tribal sovereign immunity at all.

308. The Final Rule's primary response to the many concerns the State raised in its Comments was that the State and other negatively impacted third parties "will be able to avail themselves of due process." *Final Rule*, 90 FR at 3635.

309. Defendants made the same argument in the 2024 Proposed Rule. The State explicitly responded in its Comments that the Supreme Court has made clear that there is no due process exception to tribal sovereign immunity. Defendants offered no response that that argument or discussion of the issue in the Final Rule.

49

310.   Even though the Department has identified environmental regulation as a consequence for state and local governments in the past and the State explicitly raised the issue in its Comments on the 2024 Proposed Rule, the Final Rule makes only a single reference to the State's Comments expressing concern about adverse environmental impacts and does not consider environmental issues at all in its response to that Comment or elsewhere in the Final Rule.

311.   States, local governments, and their citizens will have no due process rights to protect them from the harm that will result from the loss of state and local environmental regulation. Tribal governments are not bound by the United States Constitution or state constitutions and have no obligation to provide due process to their own members, let alone third parties.

312.   The Final Rule asserts that due process will protect against the consequences of "gaming development" but cites no support for that assertion. *Final Rule*, 90 FR at 3635. Federal acknowledgement entitles an Indian Tribe to seek to operate under the IGRA. There is no separate proceeding that would provide additional due process.

313.   Defendants cite authority for the proposition that states and other third parties will at least notionally have an opportunity for what Defendants call due process in connection with trust land acquisitions. But Defendants still failed to consider an important aspect of the problem and relied on authority that no longer applies with the same force.

50

314. In the 2015 Final Rule, the Department "explained that numerous commenters argued that re-petitioning would 'undermine[] finality and certainty' and '[be] unfair to stakeholders.'" *2022 Proposed Rule*, 87 FR at 24914 (quoting *2015 Final Rule*, 80 FR at 37874).

315. The *Chinook* court declined to rely on those justifications to support the 2015 Final Rule because the Department pointed them out but did not adopt them as its own. But the court did note that those justifications were more compelling than the justifications the Department had adopted.

316. In the 2022 Proposed Rule, the Department proposed to consider those third-party interests as compelling in favor of retaining the ban and discussed them in detail.

317. The Final Rule does not indicate any basis to support a conclusion that the third-party interests the Department characterized as compelling in 2022 meaningfully changed between 2022 and 2024.

318. To the contrary, those interests only strengthened as approximately two more years passed.

319. But the Final Rule inexplicably—and without explanation—downgraded those third-party interests from "compelling," *2022 Proposed Rule*, 87 FR at 2914, to "significant" and "legitimate." *Final Rule*, 90 FR at 3635. And the Department cut out the vast bulk of its description of those third-party interests.

320. At same time, the Department—again without explanation—upgraded denied petitioners' claimed interests from "not . . . compelling," *2022 Proposed Rule*, 87 FR at 24910, to "compelling." *Final Rule*, 90 FR at 3635.

321. The Department offered no explanation for its upgrade of denied petitioners' claimed interests to compelling, nor is any evident.

322. While any benefit to re-petitioners is unclear, re-petitions immediately deprive the State and other third parties of the benefits of finality and repose.

323. Finality and repose are important in the context of any past final administrative or judicial decisions.

324. Finality and repose are especially important in this context. Congress has independently recognized that land claims "result[ ] in severe economic hardships for the residents of the" area. *Mashantucket Pequot Indian Claims Settlement Act*, PL 98-134, 97 Stat. 851, § 2(b); *see also Mohegan Nation of Connecticut Land Claims Settlement Act of 1994*, PL 103-377, 108 Stat. 3501, § 2(a)(6) (Oct. 19, 1994) (recognizing the "economic hardships" land claims cause).

325. The Final Rule does not consider the uniquely disruptive and economically devastating nature of land claims. The State discussed it extensively. The Final Rule mentions land claims once (aside from one other time it quotes a reference to land claims in Comments) and says simply that "affected third parties will be able to avail themselves of due process afforded in connection with" land claims and other "specific issues." *2025 Final Rule*, 90 FR at 3635.

326.    The Final Rule also offers no reasoned explanation for why Defendants chose to reverse position from not allowing re-petitioning to allowing re-petitioning instead of taking the moderate approach of allowing re-petitioning with the consent of the third parties whose interests in finality and repose would be impaired.

327.    The Final Rule is internally inconsistent on this issue. In one section of the Final Rule, Defendants say the Final Rule "seeks to balance" third-party "interests in finality" against denied petitioners' "interests in re-petitioning." *Final Rule*, 90 FR at 3635.

328.    A third-party consent requirement would have been a natural way to strike that balance.

329.    The process of requesting and receiving third party consent would have allowed for negotiation and collaboration that the Final Rule does not.

330.    A third-party consent option would have allowed Defendants to focus their limited time and resources on re-petitions that did not raise finality and repose concerns that third parties chose to assert.

331.    All indications are that such a system would have worked better for re-petitioners as a whole and Defendants (as well as third parties).

332.    Defendants did not mention the third-party consent option at all in the section of the Final Rule where Defendants purported to "seek[ ] to balance" third-party "interests in finality" against denied petitioners' "interests in re-petitioning." *Final Rule*, 90 FR at 3635.

333. Defendants discussed the third-party consent option in a later miscellaneous section and dismissed the third-party consent option with *ipse dixit* that "the Department does not consider a third-party consent condition appropriate" and discussion that was focused entirely on the Department's interest, *Final Rule*, 90 FR at 3639, with no mention of or consideration of the third-party interests the Department acknowledged are "significant" and "legitimate" elsewhere in the same Final Rule, *id.* at 3635, and found "compelling" a mere three years before. *2022 Proposed Rule*, 87 FR at 2914.

334. To the extent the Final Rule addresses any of the above issues, its analysis is conclusory at best and falls far short of the reasoned explanation Defendants would have needed to provide to lawfully reverse their longstanding earlier position that re-petitioning is not permitted, especially given the serious reliance interests at stake.

## 2. The Final Rule inexplicably reverses the Department's position to be responsive to clearly incorrect dictum in *Chinook* while ignoring that court's indisputably correct statement in the very next sentence.

335. The Final Rule purports to justify its reversal from the 2022 Proposed Rule (which was consistent with decades of precedent) as an effort to "be responsive to the *Chinook* court's 'skeptic[ism] that res judicata is applicable in a situation such as this where legal standards changed between the 1994 and 2015 regulations.'" *Final Rule*, 90 FR at 3635 and n. 100 (quoting *Chinook*, 2020 WL 128563, at *9 for the proposition that "res judicata does not apply when legal standards governing the

54

issues are '**significantly different**'" and noting that *Chinook* cited *Golden Hill*, 463 F. Supp. 2d at 199 (emphasis added)).

336. That rationale is arbitrary and capricious for multiple reasons.

337. The Department continues to "maintain[ ] that the legal standards in the 2015 regulations are **not significantly different** from those in the previous regulations and do not compel the Department to allow re-petitioning." *Final Rule*, 90 FR at 3635 (emphasis added). Therefore, the *Chinook* court's statement is not applicable by Defendants' own logic.

338. The *Chinook* court's statement was not new—it was there when Defendants issued the 2022 Proposed Rule that would have maintained the re-petitioning ban. Defendants offer no reason for their newly claimed need to reverse themselves to respond to it.

339. The *Chinook* court's statement about skepticism was clear dictum.

340. Likely because the statement was pure dictum, the *Chinook* court's statement was legally incorrect in multiple respects.

341. The State advised Defendants of those errors in the *Chinook* court's dictum in the State's Comments on both the 2022 Proposed Rule and the 2024 Proposed Rule.

342. Despite that, Defendants relied on the *Chinook* court's erroneous dictum to reverse their position from the 2022 Proposed Rule.

343. The Final Rule does not address—let alone persuasively rebut—the State's arguments about the *Chinook* court's dictum.

344. Defendants' unexplained reliance on erroneous dictum in the Final Rule was arbitrary and capricious.

345. The Final Rule is clearly based on incorrect statements of the law.

346. Immediately after the erroneous dictum Defendants relied on, the *Chinook* court went on to state that "[a]ppeals to finality when justifying the re-petition ban are more convincingly premised on a desire to protect settled expectations and avoid unfair[ness] to stakeholders . . . who have already litigated against [an] unsuccessful original petition." *Chinook*, U.S. Dist. LEXIS 4869, at *24 (quotation marks omitted).

347. Defendants offer no explanation for why they felt compelled to "be responsive" to the *Chinook* court's clearly incorrect dictum when the court immediately followed that dictum with a clear and inarguable statement that a desire to protect settled expectations and avoid unfairness to third parties would be a more convincing basis for retaining the re-petitioning ban. *Final Rule*, 90 FR at 3635.

348. Defendants' cherry picking was arbitrary and capricious, particularly given that Defendants have much more information about the impacts of re-petitioning on third parties than the *Chinook* court did.

349. Defendants rely on statements by the *Burt Lake* court and the *Chinook* court that Defendants claim indicate that fairness to previously denied petitioners is a valid justification for re-petitioning.

350. The *Burt Lake* court and the *Chinook* court heard claims by previously denied petitioners and no states or third party entities or individuals were involved

in those proceedings and able to inform those courts of the negative impacts of re-petitioning.

351.    Defendants' reliance on statements by the *Burt Lake* and *Chinook* courts was arbitrary and capricious.

352.    The Supreme Court has made clear that agency legal determinations should not be colored by the agency's policy preferences.

353.    The Final Rule shows that Defendants' policy preferences colored their legal interpretations here.

### 3.    The Final Rule's procedures unlawfully discriminate in favor of unsuccessful petitioners and against the State and other third parties.

354.    The process of Federal Acknowledgment determines the predicate question of whether a petitioner is entitled to a government-to-government relationship with the United States and status as a domestic dependent sovereign.

355.    Unless and until a petitioner successfully completes the process and finally obtains federal acknowledgment, the petitioner does not have a sovereign political relationship with the United States.

356.    Re-petitioners have already been held in final determinations by Defendants to not be entitled to a government-to-government relationship with the United States and status as a domestic dependent sovereign.

357.    There is no basis in the Constitution or the law for Defendants to treat re-petitioners who were previously denied acknowledgment more favorably than third parties.

358.    The Final Rule gives unsuccessful petitioners up to five years to prepare any legal argument and gather any newly discovered evidence.

359.    The Final Rule gives third parties only 120 days to comment on a re-petition.

360.    The Final Rule gives unsuccessful petitioners more than fifteen times as long to prepare their re-petitions than it gives third parties to respond.

361.    Multiple federally acknowledged Indian Tribes objected to that disparity, as did the State and other Commenters.

362.    The Department responded that based on its experience "processing new documented petitions under the 2015 regulations and receiving comments on those petitions, a 120-day period is sufficient." *Final Rule*, 90 FR at 3640.

363.    That response focused on the Department with no consideration of the third parties who expressed concerns about timing and suffer the consequences of the short response time.

364.    The Department's comparison to new documented petitions was arbitrary and capricious.

365.    New documented petitions do not present issues of finality and repose for third parties.

366.    Re-petitions present issues of finality and repose.

367.    New documented petitions contain less information to review than do re-petitions based on complete prior administrative and judicial records.

368. New documented petitions are available to third parties so they can review them and prepare comments.

369. The Department's artificially short Comment deadline on re-petitions imposes additional burdens on third parties that already have incurred substantial burdens in successfully opposing the initial petition.

370. The Department elsewhere admits that those burdens are "overwhelming" to the Department itself given that the re-petitions involve "decades-old administrative records that rang[e] in excess of 30,000 pages to over 100,000 pages." *Final Rule*, 90 FR at 3635 (quotation marks omitted).

371. The Department has a permanent staff of trained researchers whose full-time job is to review petitions.

372. The State does not have a permanent staff of trained researchers whose full-time job is to review petitions.

373. The Department has control over the timeline in which it needs to review a re-petition.

374. The State does not have control over the timeline in which it needs to review a re-petition.

375. Given that the initial petitions involving the State were finally decided by the Department over two decades ago, nearly all of the State's staff who worked on the initial petitions has moved on to other positions outside their prior offices, retired, or died.

376.    On information and belief, few—if any—third parties have a permanent staff of trained researchers whose full-time job is to review petitions.

377.    The Department failed to consider those issues.

378.    Consistent with the State's Comments, multiple federally acknowledged Indian Tribes and other Commenters requested deadlines longer than 120 days and one requested "that the time frame should be extended to at least one year from the date of notice of the re-petition request in the **Federal Register**." *Final Rule*, 90 FT at 3640 (bolding in the original).

379.    Defendants' rejection of those requests was arbitrary and capricious.

380.    The OFA is currently reviewing fourteen documented petitions.

381.    The Final Rule adopted § 83.53(c), which provides that "[t]he Department will prioritize review of documented petitions over review of re-petition requests, except that re-petition requests pending on OFA's register for more than two years shall have priority over any subsequently filed documented petitions."

382.    Given that Defendants have fourteen documented petitions pending and are required to prioritize them over re-petition requests, there is no reason why the Final Rule could not have allowed Commenters on re-petition requests at least a year to respond.

383.    The Final Rule does not offer any basis to conclude that allowing Commenters additional time would have impaired the Department's ability to perform its duties.

384. No reason why allowing Commenters additional time would have impaired the Department's ability to perform its obligations is evident.

385. Defendants dismissed those concerns by asserting that Commenters would be able to request that the Assistant Secretary-Indian Affairs grant a discretionary extension of the deadline for good cause. *See Final Rule*, 90 FR at 3640 n. 136 (referencing 25 C.F.R. § 83.8(a)).

386. Commenters' ability to request that the Assistant Secretary-Indian Affairs grant a discretionary extension of the deadline for good cause does not cure the problem.

387. 25 C.F.R. § 83.8(a) does not specify when an extension must be filed.

388. The State requested an extension of the comment deadline on the STN request to re-petition on March 27, 2026, over a month before the deadline.

389. Defendants received the request for an extension.

390. When the State had not received a response to its request for an extension after a reasonable time period, multiple inquiries were made regarding its status and when the State could expect an answer.

391. Defendants verbally indicated multiple times that they were likely to grant the extension but would not give an official answer.

392. Despite Defendants' verbal assurances that an extension was likely to be granted, Defendants refused to provide a putatively official response until 4:33 pm on April 28, 2026, over a month after the State requested the extension and the day before the Comments were due.

393. The official who provided that response did not identify the basis of her claimed authority to respond and it appears that she—in fact—lacked the authority to respond to the State's extension request.

394. As a result of Defendants' unexplained and inexplicable delay in responding to a simple extension request, the State was forced to expend considerable additional resources to prepare comments on the assumption that Defendants either would not respond to the extension request before the deadline or would deny it.

395. Defendants' failure to give a response to a simple request for an extension within a reasonable time period was arbitrary and capricious.

396. Defendants' failure to provide a response to a simple extension request from an individual with proper authority was arbitrary and capricious.

397. The official's response to the State's extension request ignored aspects of the State's request and was otherwise arbitrary and capricious.

398. Defendants' conduct in connection with the State's extension request and at least one other extension request shows that Defendants' reliance in the Final Rule on extension requests to respond to concerns that the timeline for comments in the Final Rule is unnecessarily and unreasonably short shows that the Final Rule is arbitrary and capricious.

399. The timing problem for comments on re-petitions is exacerbated by the information disparity the Final Rule establishes between re-petitioners and third parties.

400. The Final Rule allows re-petitioners to re-petition based on "[n]ew evidence (i.e., evidence not previously submitted by the petitioner)." 25 C.F.R. § 83.48(b).

401. Re-petitioners presumably know what evidence they previously submitted.

402. Third parties do not know what evidence the re-petitioner previously submitted.

403. The State pointed out to Defendants that third parties would need the information previously submitted by the petitioner to be able to assess whether the claimed 'new evidence' that forms the basis for a re-petition is, in fact, new.

404. The Final Rule does not address that issue at all.

405. That failure alone renders the Final Rule arbitrary and capricious, but Defendants' refusal to provide third parties access to the previously submitted evidence is inexplicable given that the Final Rule otherwise relies on digitization and the change to electronic records (which would make it easier for Defendants to provide previously submitted evidence to third parties) to support allowing re-petitioners to undo past decisions based on allegedly new evidence. *See Final Rule*, 90 FR at 3638.

406. The Final Rule also codifies another information disparity by allowing the AS-IA to initiate and consider research relative to the re-petition request and other information, share it with the re-petitioner (and only the re-petitioner), and give the re-petitioner an opportunity to respond. *See* 25 C.F.R. § 83.55.

63

407. The State raised this issue in its Comments.

408. Defendants did not consider or address the issue in the Final Rule.

409. APA due process gives participants in a proceeding the right to know the evidence being considered and the opportunity to rebut it.

410. Constitutional due process gives participants in a proceeding the right to know the evidence being considered and the opportunity to rebut it.

411. The information disparities in the Final Rule violate due process.

412. The Final Rule does not provide any analysis or authority to support Defendants' discrimination against third parties in the procedure for addressing re-petitions.

413. There is no lawful basis for Defendants' discrimination against third parties in the procedure for addressing re-petitions.

### 4. The Final Rule arbitrarily allows only one side of past acknowledgment disputes to seek to undo the past determination.

414. The State has consistently argued that the Department must maintain the re-petitioning ban based in part on the importance of finality and the reliance interests third parties have developed in the final determinations made long ago denying acknowledgment.

415. In the Final Rule, Defendants decided to allow re-petitioning, over the objections of the State and many other Commenters.

416. In its Comments, the State argued that if Defendants decided to revisit past negative determinations at the behest of previously unsuccessful petitioners, it

would be unconstitutional, arbitrary, and capricious for Defendants to not allow third parties to challenge past positive acknowledgment determinations.

417.    The interests of federally acknowledged Indian Tribes in past positive determinations are similar to the interests of states and other third parties in past negative determinations.

418.    The Final Rule does not address that issue.

### 5.    The Final Rule's selective reliance on the Federal Rules of Civil Procedure is arbitrary and capricious.

419.    Defendants assert the authority to reconsider past purportedly final determinations even if those determinations have previously been upheld by an Article III court.

420.    As discussed above, Defendants lack the statutory authority to reconsider past purportedly final determinations, especially when those determinations have previously been upheld by an Article III court.

421.    As discussed above, Defendants lack the constitutional authority to reconsider past purportedly final determinations, especially when those determinations have previously been upheld by an Article III court.

422.    The State argued in its Comments that if Defendants chose to claim the authority to reconsider past purportedly final determinations even if those determinations have previously been upheld by an Article III court, principles of the separation of powers and constitutional avoidance required Defendants to apply the

same standards a court would apply when deciding whether to reconsider or reopen a final judgment.

423.    Defendants refused to apply a standard comparable to the one used in the Federal Rules for reconsidering past final determinations in the Final Rule.

424.    The Final Rule violates the separation of powers to the extent it purports to grant Defendants greater authority and more time to reconsider past decisions than a court would have.

425.    The Final Rule does not consider the separation of powers implications of allowing an Article II agency greater authority to undo prior determinations upheld on Article III judicial review than an Article III court would have.

426.    Instead of adopting a standard based on the Federal Rules that deal with prior judgments, Defendants adopted a standard modeled off the standard "for surviving a motion to dismiss under FRC.P. 12(b)(6)." *Final Rule*, 90 FR at 3637.

427.    The Final Rule's application of the Rule 12 motion to dismiss standard in this context rather than the Rule 59 or Rule 60 standard is arbitrary and capricious.

428.    When Defendants previously proposed allowing re-petitioning in the 2014 Proposed Rule, they "would have required a petitioner to prove 'by a preponderance of the evidence' that '[a] change from the previous version of the regulations to the current version of the regulations warrants reconsideration of the final determination.'" *Final Rule*, 90 FR at 3636.

429. Courts recognize that the preponderance of the evidence is a higher burden than plausibility.

430. The Final Rule acknowledges that a preponderance of the evidence standard "might seem higher" but says "that is at best unclear because the 2014 proposed rule did not clarify what was meant by 'warrants reconsideration.'" *Final Rule*, 90 FR at 3636.

431. Defendants' attempt to argue that it is unclear that a preponderance of the evidence is a higher standard than plausibility lacks merit.

432. Defendants' reversal of position from the 2014 Proposed Rule to the Final Rule was arbitrary and capricious.

433. Courts require a Rule 60 movant seeking relief based on newly discovered evidence to show that the evidence is highly convincing.

434. Plausibility is a far lower standard than highly convincing.

435. Courts require that a Rule 60 movant seeking relief based on newly discovered evidence to prove that granting the motion will not impose any undue hardship on the other parties.

436. The Final Rule does not require re-petitioners to show that allowing re-petitioning will not impose any undue hardship on the other participants in the prior proceedings.

437. The Final Rule is contrary to the constitution, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law to the extent it applies

a standard inconsistent with the Federal Rules of Civil Procedure as they apply to efforts to undo prior final determinations.

438. The Final Rule is contrary to the constitution, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law to the extent it allows Defendants to undo prior final determinations based on a lesser showing than a court would require or under circumstances where a court would not grant relief from a prior final determination.

### 6. The Final Rule's reversal regarding review of re-petitions was arbitrary and capricious.

439. The last time the Department proposed re-petitioning, it proposed that re-petition requests would be heard by a judge with the Office of Hearings and Appeals ("OHA").

440. The Department reasoned that "[h]aving an OHA judge review re-petitioning requests promotes consistency, integrity, and transparency in resolving re-petition requests." *2014 Proposed Rule*, 79 FR at 30767.

441. The Department publicly represents that the OHA provides an impartial forum for parties who are affected by the decisions of the Department's bureaus and offices to obtain independent review of those decisions.

442. The OHA includes the Interior Board of Indian Appeals ("the IBIA"), which hears administrative appeals from decisions made by the BIA and other Department officials involving Indian matters.

443. The IBIA has extensive experience reviewing petitions for acknowledgment.

444. The IBIA was involved in many of the prior unsuccessful attempts to obtain acknowledgment that could lead to re-petitions under the Final Rule.

445. The IBIA was involved in all of the prior unsuccessful attempts by groups located in Connecticut to obtain acknowledgment.

446. The Final Rule reversed position. Instead of requests to re-petition being heard and decided by an impartial OHA Judge as set forth in the 2014 Proposed Rule, the Final Rule provides that requests to re-petition will be heard and decided by the AS-IA. *Final Rule*, 90 FR at 3637.

447. The AS-IA is a political appointee who serves at the pleasure of the President.

448. The Final Rule does not reference integrity in explaining the reversal, let alone explain why the Final Rule switched review of re-petition requests from an impartial OHA Judge—which promotes integrity—to a political appointee.

449. The Final Rule does not reference consistency in explaining the reversal, let alone explain why the Final Rule switched review of re-petition requests from an impartial OHA Judge—which promotes consistency—to a political appointee.

450. The Final Rule does not reference transparency in explaining the reversal, let alone explain why the Final Rule switched review of re-petition requests from an impartial OHA Judge—which promotes transparency—to a political appointee.

451. The Final Rule responds to the Comments raising this concern with two sentences that are insufficient to address the issue.

452. The Final Rule's reversal is arbitrary and capricious.

## C.    The Final Rule unlawfully targets Connecticut.

453. According to the Final Rule, there were thirty-three unsuccessful petitioners as of November 9, 2024. *See* 90 FR at 3630 n. 57. They are located in sixteen states: Alabama, California, Colorado, Connecticut, Florida, Georgia, Indiana, Massachusetts, Michigan, New Jersey, Oklahoma, Oregon, Tennessee, Washington, Wisconsin, and Vermont.

454. The majority of States with unsuccessful petitioners have only a single unsuccessful petitioner within their boundaries.

455. Four unsuccessful petitioners are in Connecticut: the STN (which has already re-petitioned), the Eastern Pequot Indians of Connecticut, the GHP, and the Paucatuck Eastern Pequot Indians of Connecticut.

456. Connecticut is the third smallest state in the United States by land area.

457. The two smaller states are Delaware and Rhode Island. There are no unsuccessful petitioners in either of those states.

458. According to the United States Census Bureau's ranking of the population density of the fifty States, the District of Columbia, and Puerto Rico, Connecticut had the sixth highest population density out of the fifty-two jurisdictions.

459. The only state with more unsuccessful petitioners within its boundaries than Connecticut is California, which has five.

70

460.    California is approximately thirty times larger than Connecticut by land area.

461.    Land claims under the Nonintercourse Act are more common in the Northeast than in California or other western states.

462.    Trust land acquisitions may have a greater impact in Connecticut than in other states impacted by the Final Rule.

463.    Many of the impacts of federal acknowledgment will have a greater impact in Connecticut than in any other state impacted by the Final Rule based on Connecticut's relatively small land area, relatively high population density, and location near large population centers.

464.    The Final Rule will impact Connecticut more than any other state.

465.    Defendants were aware that the Final Rule would impact Connecticut more than any other state.

466.    The Final Rule purports to allow re-petitioning based on changes to the acknowledgment regulations. *See* 25 C.F.R. § 83.48(a).

467.    The acknowledgment regulations were changed to provide that "evidence of 'land set aside by a State for the petitioner or collective ancestors of the petitioner' may be used to satisfy" criteria (b) (Community) and (c) (Political Authority). *Final Rule*, 90 FR at 3628 & n.24 (quoting 80 FR  37865).

468.    That change was a reversal of prior agency precedent rejecting that argument in the context of Connecticut petitioners, including the STN. *See In re Federal Acknowledgment of the Historical Eastern Pequot Tribe*, 41 IBIA 1, 20 (May

71

12, 2005); *In re Federal Acknowledgment of the Schaghticoke Tribal Nation*, 41 IBIA 30 (May 12, 2005).

469.    That change was contrary to Connecticut law, Connecticut Supreme Court precedent, and federal court precedent applying that law. *See, e.g.*, *Golden Hill Paugussett Tribe of Indians v. Rell*, 463 F. Supp. 2d 192, 201 n.6 (D. Conn. 2006) (citing Conn. Gen. Stat. § 47-66h(b)).

470.    The Connecticut Supreme Court has the final word on what Connecticut statutes mean.

471.    The Connecticut Supreme Court has held that Connecticut's statutes were not intended to—and cannot—be used as a basis for federal acknowledgment.

472.    Defendants lack the authority to override that determination.

473.    Even if Defendants had the authority to override Connecticut courts' interpretation of Connecticut laws (they do not), reliance on Connecticut state reservations to support federal acknowledgment would be arbitrary and capricious.

474.    The Final Rule purports to allow re-petitioning based on changes reflected in the 2015 Final Rule.

475.    The Department made clear in the 2015 Final Rule that it did not intend to change the substantive criteria for acknowledgment or to change the result in any previously denied petition. Consistent with that, the re-petitioning ban was an integral part of the 2015 Final Rule and Defendants relied on the re-petitioning ban to dismiss concerns of commenters.

476. The 2015 Final Rule was arbitrary and capricious because it failed to understand and consider important aspects of the changes it made and suffered from internal inconsistencies.

477. The Final Rule is unconstitutional to the extent it purports to allow groups an opportunity to re-petition without showing that they have maintained social solidarity and distinctness and exercised political influence and authority throughout history until the present.

## Claims for Relief

## Count 1: Excess of statutory authority in violation of 5 U.S.C. § 706(2)(C)

478. The State incorporates all preceding allegations in paragraphs 1 through 477.

479. The Final Rule exceeds Defendants' statutory authority.

480. Because the Final Rule exceeds Defendants' statutory authority, the Court should hold the Final Rule unlawful and set it aside pursuant to 5 U.S.C. § 706(2)(C).

## Count 2: Contrary to constitutional right and power in violation of 5 U.S.C. § 706(2)(B)—Nondelegation.

481. The State incorporates all preceding allegations in paragraphs 1 through 477.

482. To the extent the statutes Defendants rely on grant Defendants— Executive Branch agencies and officials—the statutory authority to acknowledge federal tribes and grant re-petitions seeking federal acknowledgment without

sufficient guidance from Congress, those statutes violate the nondelegation doctrine and the Final Rule is invalid.

483.   To the extent the statutes Defendants rely on grant Defendants—Executive Branch agencies and officials—the statutory authority to take action that is inconsistent with judgments of Article III Courts without sufficient guidance from Congress, those statutes violate the nondelegation doctrine and the Final Rule is invalid.

484.   Because the Final Rule is contrary to the United States Constitution, the Court should hold the Final Rule unlawful and set it aside pursuant to 5 U.S.C. § 706(2)(B).

## Count 3: Contrary to constitutional right and power in violation of 5 U.S.C. § 706(2)(B)—the separation of powers and Article III.

485.   The State incorporates all preceding allegations in paragraphs 1 through 477.

486.   The Final Rule is contrary to the separation of powers in the United States Constitution because it purports to grant Defendants—Executive Branch agencies and officials—the authority to take action that is inconsistent with judgments of Article III Courts.

487.   The Final Rule is contrary to the separation of powers in the United States Constitution because it purports to grant Defendants—Executive Branch agencies and officials—the authority to take action that is inconsistent with judgments of Article III Courts based on standards and timing requirements that impose a lower burden on the entity seeking to impact the prior judgment than the

74

standards and timing requirements an Article III Court would apply in considering a comparable request.

488. Because the Final Rule is contrary to the United States Constitution, the Court should hold the Final Rule unlawful and set it aside pursuant to 5 U.S.C. § 706(2)(B).

## Count 4: Contrary to constitutional right and power in violation of 5 U.S.C. § 706(2)(B)—Equal treatment.

489. The State incorporates all preceding allegations in paragraphs 1 through 477.

490. The Final Rule is contrary to the United States Constitution because it treats the State, other entities, and individuals less favorably than it treats unsuccessful petitioners.

491. The Final Rule is contrary to the United States Constitution because it targets the State in violation of the Tenth Amendment, the Equal Sovereignty Doctrine, the Equal Footing Doctrine, and/or the State as a State Doctrine.

492. The Final Rule is contrary to the United States Constitution because it discriminates against the State in violation of the Fifth Amendment.

493. The Final Rule is contrary to the United States Constitution because it discriminates against entities and individuals within the State in violation of the Fifth Amendment.

494. Because the Final Rule is contrary to the United States Constitution, the Court should hold the Final Rule unlawful and set it aside pursuant to 5 U.S.C. § 706(2)(B).

## Count 5: Without observance of procedure required by law in violation of 5 U.S.C. § 706(2)(D).

495. The State incorporates all preceding allegations in paragraphs 1 through 477.

496. The Final Rule was promulgated without observance of procedure required by law, including—but not limited to—the Fifth Amendment to the United States Constitution, the APA, the RFA, and the above-referenced Executive Orders that have the force of law.

497. Because the Final Rule was promulgated without observance of procedure required by law, the Court should hold the Final Rule unlawful and set it aside pursuant to 5 U.S.C. § 706(2)(D).

## Count 6: Arbitrary, capricious, and an abuse of discretion in violation of 5 U.S.C. § 706(2)(A).

498. The State incorporates all preceding allegations in paragraphs 1 through 477.

499. The substance of Final Rule is arbitrary, capricious, and an abuse of discretion.

500. The procedure that led to the Final Rule was arbitrary, capricious, and an abuse of discretion.

501. Because the Final Rule is arbitrary, capricious, and an abuse of discretion, the Court should hold the Final Rule unlawful and set it aside pursuant to 5 U.S.C. § 706(2)(A).

76

## Count 7: Injunction against unlawful agency action.

502. The State incorporates all preceding allegations in paragraphs 1 through 477.

503. The State requests equitable relief in the form of injunctive relief prohibiting Defendants from engaging in unlawful actions pursuant to the Final Rule.

### Prayer for Relief

WHEREFORE, the State respectfully requests that this Court:

1. Issue a temporary order under 5 U.S.C. § 705 prohibiting Defendants from accepting any requests to re-petition under the Final Rule for consideration until this Court decides whether to grant relief of longer duration;

2. Issue a temporary order under 5 U.S.C. § 705 prohibiting Defendants from processing any requests to re-petition under the Final Rule until this Court decides whether to grant relief of longer duration;

3. Issue a temporary order under 5 U.S.C. § 705 that the State's deadline(s) to file comments on any re-petition requests be extended until 90 days after this Court decides whether to grant relief of longer duration;

4. Issue a preliminary order under 5 U.S.C. § 705 prohibiting Defendants from accepting any requests to re-petition under the Final Rule for consideration until the final resolution of this suit;

5. Issue a preliminary order under 5 U.S.C. § 705 prohibiting Defendants from processing any requests to re-petition under the Final Rule until the final resolution of this suit;

77

6.    Enter a final judgment holding the Final Rule unlawful and setting the Final Rule aside pursuant to 5 U.S.C. § 706.

7.    Enter a final judgment declaring the Final Rule unlawful.

8.    Declare that Defendants are prohibited from accepting any re-petitions under the Final Rule for filing;

9.    Declare that Defendants are prohibited from processing any re-petitions under the Final Rule that have been submitted to Defendants for consideration at the time the judgment is issued;

10.    Issue a permanent injunction prohibiting Defendants from accepting any re-petitions under the Final Rule for filing;

11.    Issue a permanent injunction prohibiting Defendants from processing any re-petitions under the Final Rule that have been submitted to Defendants for consideration at the time the judgment is issued;

12.    In the alternative, enter a judgment holding the Final Rule unlawful, remanding it, and:

   a. Requiring Defendants to consider the State's challenges to Defendants' constitutional and statutory authority to consider requests to re-petition and set forth authority that supports the power they assert in any proposed rule following remand if they seek to continue to allow re-petitioning;

   b. Requiring Defendants to engage in a new notice and comment period if they seek to continue to allow re-petitioning;

78

c.  Requiring Defendants to treat all individuals and entities other than already federally acknowledged Indian Tribes equally as to procedure and substance in any and all proceedings on remand and proposed rules that follow;

d.  Requiring Defendants to comply with all aspects of the Federalism Executive Order on remand;

e.  Requiring Defendants to comply with all aspects of the Regulatory Flexibility Act on remand;

f.  Requiring any proposed rule following a remand to provide the State and other third parties with prompt access to all information that may be considered in deciding any request to re-petition without cost to the State and other third parties;

g.  Requiring that any proposed rule following a remand provide that Defendants will respond to any requests for an extension under 25 C.F.R. § 83.8(a) or otherwise within one week of receipt; and

h.  Requiring Defendants to allow the State to supplement its Comments on the STN request to re-petition in the event that request remains under consideration on remand;

13.  Awarding the State attorney's fees and costs to the extent permitted by law;

14.  Grant any other and further relief the State concludes is necessary and appropriate based on developments in this litigation;

15.     Grant any other and further relief the Court deems just, equitable, and appropriate.

Respectfully submitted,

PLAINTIFF
STATE OF CONNECTICUT

WILLIAM TONG
ATTORNEY GENERAL

BY: */s/ Robert J. Deichert*
Robert Deichert (ct24956)
Michael Rondon (ct31022)
Elizabeth Lewis (ct32141)
Assistant Attorneys General
Attorney General's Office
165 Capitol Avenue
Hartford, CT 06106
860-808-5020 (phone)
860-808-5347 (fax)
robert.deichert@ct.gov
michael.rondon@ct.gov
elizabeth.lewis@ct.gov